*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

*TODD ELLIS,*                                      )
                                                  )
                        *Plaintiff*                )
                                                  )
*v.*                                               )          *No. 2:13-cv-80-JAW*
                                                  )
*UNUM LIFE INSURANCE COMPANY*                      )
*OF AMERICA, et al.,*                              )
                                                  )
                        *Defendants*               )

*RECOMMENDED DECISION ON CROSS-MOTIONS FOR*
*JUDGMENT ON THE RECORD*

Plaintiff Todd Ellis moves for judgment on the record on his claim that defendants Unum

Life Insurance Company of America and Unum Group (together, "Unum") arbitrarily and

capriciously terminated his long-term disability ("LTD") benefits in violation of his rights

pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

*See* Motion for Judgment on the Record ("Plaintiff's Motion") (ECF No. 14) at 1, 21-23;

Complaint (ECF No. 1-1), Exh. A to Notice of Removal (ECF No. 1).   Unum cross-moves for

judgment on the record in its favor on Ellis's claim.   *See* Defendant's Motion for Judgment on

the Administrative Record ("Defendant's Motion") (ECF No. 13) at 1-3, 21.   For the reasons that

follow, I recommend that the court grant the Defendant's Motion and deny the Plaintiff's.

**I.   Applicable Legal Standards**

A denial of ERISA benefits "is to be reviewed under a *de novo* standard unless the

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan."   *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 115 (1989).   "[T]he threshold inquiry is whether the Plan language constitutes a clear

grant of discretionary authority." *Ballesteros v. Bangor Hydro-Electric Co.*, 497 F.Supp.2d 1, 7 (D. Me. 2007).

The parties agree, and the record reveals, that the relevant plan language accords Unum discretionary authority to determine eligibility for benefits and interpret policy terms and provisions. *See* Plaintiff's Motion at 10; Defendant's Motion at 3-4; Administrative Record ("Record") at 71 ("When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."). As a result, "the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Gannon v. Metropolitan Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004) (citations and internal quotation marks omitted). "In other words, the administrator's decision must be upheld if it is reasoned and supported by substantial evidence." *Id*. "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." *Id*.

By cross-moving for judgment based on the administrative record filed in this case, the parties empower the court to adjudicate this case based on that record, resolving any factual as well as legal disputes. *See, e.g., Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 31 (1st Cir. 2000) ("In a case submitted for judgment on a stipulated record, the district court resolves disputed issues of material fact.") (citation omitted).

## II.  Factual Background

The scheduling order entered in this case directed that each side submit, with his or its motion and incorporated memorandum of law, "an appendix setting forth a brief recitation of the facts, accompanied by record citations, upon which the moving party relies for the requested

relief." ECF No. 10 at 4. The objecting party was to "identify any of the moving party's record citations to which the objecting party disagrees, setting forth the basis of such disagreement and what part of the record, if any, the Court should consider." *Id*. To the extent that no disagreement is noted, I treat particular paragraphs of each party's appendix as admitted, although I have exercised discretion to conform even admitted statements to the underlying Record as necessary. Ellis has identified no disagreement with any of Unum's record citations. To the extent that Unum has identified disagreements with those of Ellis, I have noted and resolved them.

### A. Unum LTD Policy Provisions

Ellis is a 51-year-old resident of Buxton, Maine, who at all material times was employed by Pape Chevrolet, Inc. ("Pape") as a General Service Technician-A Class. Appendix ("Plaintiff's Appx.") (ECF No. 14-1), attached to Plaintiff's Motion, ¶ 1; Record at 134. Ellis worked on all types of vehicles but was especially trained to work on heavy trucks. Plaintiff's Appx. ¶ 2; Record at 291. Ellis has been employed as an automobile mechanic for various organizations throughout Maine for almost 30 years and has completed numerous training courses and certifications in his chosen field, including certifications as a Master Automobile Technician and Master Medium/Heavy Truck Technician from the National Institute for Automotive Service Excellence. Plaintiff's Appx. ¶ 3; Record at 287-94. Ellis has a high school diploma and has not completed any formal training in any field other than the automotive industry. Plaintiff's Appx. ¶ 4; Record at 288-94.

Effective October 1, 2003, Unum issued a policy of disability insurance to Pape, group policy number 588140 001 (the "Policy"). Defendant's Appendix of Facts ("Defendant's

Appx.") (ECF No. 13-1), attached to Defendant's Motion, ¶ 2; Record at 61-103.  Ellis was insured under the Policy.  Defendant's Appx. ¶ 2; Record at 52-57.[1]

The Policy states that a participant is entitled to LTD benefits "when Unum determines that . . . you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and . . . you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."  Defendant's Appx. ¶ 3; Plaintiff's Appx. ¶ 6; Record at 75 (boldface omitted).  After 24 months of payments, "you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." *Id.* (boldface omitted).

The Policy defines "material and substantial duties" as those duties that "are normally required for the performance of your regular occupation; and . . . cannot be reasonably omitted or modified . . . ."  Defendant's Appx. ¶ 4; Plaintiff's Appx. ¶ 7; Record at 91.  "Regular occupation" means "the occupation you are routinely performing when your disability begins . . .[, and] Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."  Defendant's Appx. ¶ 4; Record at 93.

Pursuant to the Policy, the participant has the burden of proving disability.  Defendant's Appx. ¶ 5; Record at 66.  The Policy provides that "[y]our proof of claim, provided at your expense, must show: . . . the cause of your disability [and] the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation . . . ."  *Id.*

---

[1] I disregard Ellis's statement that he contracted with Unum for LTD insurance.  Plaintiff's Appx. ¶ 5.  As Unum notes, the record indicates that Pape, not Ellis, contracted with Unum.  Defendant's Response to Plaintiff's Appendix of Facts in Support of His Motion for Judgment on the Record ("Defendant's Appx. Response") (ECF No. 17) ¶ 5; Record at 61.

The Policy further provides that Unum "may request that you send proof of continuing disability indicating that you are under the regular care of a physician." *Id*. "Unum will deny your claim, or stop sending you payments, if the appropriate information is not submitted." *Id*. Likewise, Unum "will stop sending you payments and your claim will end on . . . the date you are no longer disabled under the terms of the plan . . . ." Defendant's Appx. ¶ 5; Record at 81.

### B.  Ellis Undergoes Neck Surgery; Unum Approves LTD Claim

While Ellis had been active and healthy for many years, he had also experienced chronic neck pain and discomfort for several years.  Plaintiff's Appx. ¶ 10; Record at 178.  During a March 13, 2008, neurosurgical consultation with neurosurgeon Konrad Barth, M.D., Ellis described ongoing neck discomfort and stiffness with intermittent numbness and parasthesias into his left arm and hand.  Plaintiff's Appx. ¶ 11; Defendant's Appx. ¶ 7; Record at 178.  He reported that he had sought some prior treatment for his back/neck pain that had provided only temporary relief, including massage therapy, chiropractic treatment, and a cervical epidural steroid injection.  Plaintiff's Appx. ¶ 12; Defendant's Appx. ¶ 7; Record at 178.  While the pain was primarily located at the base of Ellis's neck, he also experienced pain across his shoulders, triceps, and forearms.  Plaintiff's Appx. ¶ 13; Record at 178.

Dr. Barth noted that an MRI dated November 4, 2007, revealed very minor degenerative changes throughout the cervical area with possible disc herniation and a more advanced degree of degeneration at C6-C7.  Plaintiff's Appx. ¶ 14; Record at 179.

During an October 2008 examination, Ellis reported to Dr. Barth that his symptoms were getting worse.  Defendant's Appx. ¶ 7; Record at 176.  He described his pain as constant but varying in intensity, alternating between sharp, stabbing, burning, aching, and throbbing in character and radiating from his neck down to his shoulders, moderately impairing his daily

activities.  Plaintiff's Appx. ¶ 15; Record at 176.  He also reported that he had begun to experience lower back pain radiating down into his left leg.  Plaintiff's Appx. ¶ 16; Record at 176.  Dr. Barth diagnosed C6-7 spondylosis, foraminal stenosis, and [herniated nucleus pulposus] with chronic refractory mechanical neck pain and intermittent left C7 radiculopathy.  Record at 177.  He recommended surgery in the form of an anterior C6-7 discectomy with interbody fusion and plating, given that Ellis's mechanical neck pain was more bothersome to him than his radicular symptoms.  *Id.*[2]

Ellis stopped working at Pape on November 7, 2008.  Defendant's Appx. ¶ 8; Record at 52.  On November 10, 2008, he underwent surgery, with Dr. Barth performing a cervical discectomy, fusion, and plating.  Defendant's Appx. ¶ 8; Plaintiff's Appx. ¶ 18; Record at 184-85.  The surgery was performed without complication.  Defendant's Appx. ¶ 8; Plaintiff's Appx. ¶ 24; Record at 185.  Although, as of October 9, 2008, Ellis reported to Dr. Barth that he was using Aleve on a regular basis, he worked full time until the Friday before the Monday surgery, with no accommodations or missed hours due to injury.  Plaintiff's Appx. ¶ 19; Record at 106, 159, 176.[3]

Ellis filed a claim for LTD benefits with Unum on November 16, 2008.  Defendant's Appx. ¶ 9; Plaintiff's Appx. ¶ 21; Record at 52-57.  He described the medical condition resulting in his disability as "cervical stenosis."  Defendant's Appx. ¶ 9; Plaintiff's Appx. ¶ 23; Record at 52.  In an Attending Physician's Statement, Dr. Barth indicated that Ellis could return to work on

---

[2] I disregard Ellis's statement that, given that conservative treatment had proven unsuccessful, he decided to proceed with surgical intervention.  Plaintiff's Appx. ¶ 17.  As Unum notes, Defendant's Appx. Response ¶ 17 (mistakenly labeled ¶ 18), it is not supported by the citation given.
[3] Unum objected that this statement as originally worded was not supported by the record citations given.  Defendant's Appx. Response ¶ 19.  I have reworded it to conform to those citations.  I omit Ellis's additional statement that it was always his intention to return to his position at Pape after his neck healed.  Plaintiff's Appx. ¶ 20.  As Unum points out, Defendant's Appx. Response ¶ 20, that statement is not supported by the citation given.

February 10, 2009, three months after the surgery.  Defendant's Appx. ¶ 9; Plaintiff's Appx. ¶ 22; Record at 57.

At a follow-up appointment with Dr. Barth on December 9, 2008, Ellis reported some modest improvement in his overall condition but persistent pain and discomfort at the base of his neck and intermittent headaches, requiring narcotic pain relief.  Plaintiff's Appx. ¶ 25; Record at 174.  Dr. Barth noted that, while Ellis was "doing reasonably well[,]" he "certainly ha[d] a ways to go."  Plaintiff's Appx. ¶ 26; Record at 174.  Dr. Barth stated that, "[g]iven the physical nature of his job I don't think he is ready to start back yet."  Plaintiff's Appx. ¶ 27; Record at 174.  Ellis was restricted from lifting more than 20 pounds and was limited in his ability to turn his head. Plaintiff's Appx. ¶ 28; Record at 106.

Two months after surgery, the pain and numbness in Ellis's left arm was almost completely resolved.  Plaintiff's Appx. ¶ 29; Record at 173.  Unfortunately, he continued to experience sharp, stabbing pain at the base of his neck, particularly when extending his neck or reaching.  Plaintiff's Appx. ¶ 30; Record at 173.  Dr. Barth noted that this "limit[ed] his ability to lift and is at a level such that he continues to take Dilaudid 2 mg tabs 1 every 5-6 hours." Plaintiff's Appx. ¶ 31; Record at 173.  At Dr. Barth's direction, Ellis remained out of work. Plaintiff's Appx. ¶ 32; Record at 173.

Unum undertook an investigation to evaluate Ellis's claim for benefits and requested medical records from Dr. Barth.  Defendant's Appx. ¶ 10; Record at 127-28, 164.  Unum received, *inter alia*:

1.     A letter dated December 9, 2008, from Dr. Barth to Daniel Loiselle, M.D., Ellis's primary care physician, stating in part that Ellis was "doing reasonably well with some modest

improvement in his condition" and "[s]pecifically[,] he's having far less in the way of pain and paresthesias into his arm."  Defendant's Appx. ¶ 11; Record at 174; and

2.      A note of an examination on February 11, 2009, stating that Ellis "continue[d] to do quite well with complete elimination of pain and paresthesias into his arm.  His primary residual complaint [was] of focal area of aching, burning and stabbing pain in the left posterior aspect at the base of the neck."  Defendant's Appx. ¶ 12; Record at 227.  Dr. Barth noted that physical examination revealed that Ellis "look[ed] comfortable" and "ha[d] good strength throughout."  *Id.*

On February 11, 2009, Dr. Barth tentatively set a return to work date of March 10, 2009. Plaintiff's Appx. ¶ 33; Defendant's Appx. ¶ 13; Record at 225-26.[4]  He recommended that Ellis undergo additional testing to determine the source of his ongoing pain:

> My impression is that though Mr. Ellis has made progress with resolution of his radicular pain there is still a significant mechanical component which is frustrating and not well delineated in terms of the etiology.  I told him that it is possible this is a result of a developing pseudoarthrosis.  On the other hand, it could be that the mechanical discomfort is being generated at another level by another cause, for instance facet arthropathy either above or below the arthrodesis.  I told him up front that there are simply no easy answers in sorting this out, but I can offer additional diagnostics in the form of a CT scan of the cervical spine as well as a bone scan.  Between these 2 forms of testing, I will certainly be in a better position to assess for the possibility of pseudoarthritis.

Plaintiff's Appx. ¶ 34; Record at 227.

As part of Unum's review, it also sought and obtained a description of Ellis's job from Pape.  Defendant's Appx. ¶ 14; Record at 131-36.  The job description for a "General Service Technician – A Class" called for "a skilled-level technician who is able to perform diagnoses and

---

[4] As Unum points out, Defendant's Appx. Response ¶ 33, Ellis's statement contained a typographical error.  I have corrected it.

repairs in all areas, in addition to being specialized in particular areas of repair[.]"  Defendant's Appx. ¶ 14; Record at 134.  The job description noted:

> While performing the duties of this job, the employee is frequently required to stand; use hands to finger, handle, or feel; reach with hands and arms; climb or balance; and stoop, kneel, crouch, or crawl.  The employee is occasionally required to sit.  The employee must occasionally lift and/or move up to 100 pounds.

Plaintiff's Appx. ¶ 8; Defendant's Appx. ¶ 14; Record at 136.

By letter dated February 27, 2009, Unum Lead Disability Benefits Specialist Derek Webb approved Ellis's LTD claim following the 90-day elimination period set forth in the Policy, and Unum began paying him more than $3,000 per month.  Defendant's Appx. ¶ 15; Plaintiff's Appx. ¶ 35; Record at 242-45.  Benefits were initially approved for the period from February 8, 2009, through March 7, 2009.  Plaintiff's Appx. ¶ 36; Record at 242.  Webb explained that, "[i]n order to qualify for ongoing benefits, you must continue to meet the definition of disability."  Defendant's Appx. ¶ 15; Record at 244.  He further explained that Ellis should send Unum updated medical records if he was unable to return to work in March.  Defendant's Appx. ¶ 15; Record at 243.

### C.  Ellis Continues To Complain of Pain; Is Diagnosed with Fibromyalgia

Despite an uncomplicated surgery, as early as March 2009, Ellis began again experiencing the same symptoms of pain that he had prior to his surgery.  Plaintiff's Appx. ¶ 37; Record at 312.

On March 3, 2009, Unum received a letter from Dr. Barth stating that Ellis "continues to complain of neck pain despite all post-operative studies look [g]ood including x/rays, bone scan and CT scan."  Defendant's Appx. ¶ 16; Record at 261.  A February 25, 2009, CT scan of Ellis's cervical spine was negative for abnormalities.  Defendant's Appx. ¶ 16; Record at 268.  Despite

9

these objective findings, Dr. Barth recommended on March 3, 2009, that Ellis "remain out of work" and noted that he had "referred him back to Dr. Nancy Ball for physiatry consult and further recommendations regarding [h]is work capacity." Defendant's Appx. ¶ 16; Plaintiff's Appx. ¶ 38; Record at 261.

Webb, of Unum, called Ellis on March 4, 2009, to inform him that Unum was extending his benefits for two additional months and would continue to monitor his health status. Defendant's Appx. ¶ 17; Record at 276. Webb noted:

> Even though surgeon said that [Ellis's] x-rays and CT scan looked good, the pain is the last to go away and [Ellis's] being referred to a physiatrist is a reasonable step. Also, given that [Ellis] is a mechanic and would likely need to look up and down and bend to work on vehicles, would more th[a]n likely add to the support of going toward max recovery period of 182 days.

Plaintiff's Appx. ¶ 39; Record at 15; *see also* Record at 276.

In a March 5, 2009, visit with Dr. Loiselle, Ellis complained that he was "aching all over[,]" with headaches and pain in his neck, shoulders, elbows, spine, and legs. Defendant's Appx. ¶ 18; Plaintiff's Appx. ¶ 43; Record at 575. His physical examination was otherwise unremarkable. Defendant's Appx. ¶ 18; Plaintiff's Appx. ¶ 43; Record at 575-76. He reported that he had continued to go to physical therapy but that the more active he was, the worse his symptoms were. Plaintiff's Appx. ¶ 42; Record at 575.[5] Dr. Loiselle stated that he believed that "anxiety is playing a large role in his symptoms." Defendant's Appx. ¶ 18; Record at 576. He also stated that Ellis had "diffuse myofascial pain syndrome without evidence of systemic disease" and "the classic trigger points of fibromyalgia." Defendant's Appx. ¶ 18; Plaintiff's Appx. ¶ 45; Record at 577.

---

[5] Unum objected that this statement as originally worded was not supported by the record citation given. Defendant's Appx. Response ¶ 42. I have reworded it to conform to that citation.

On Dr. Barth's referral, Ellis consulted with Dr. Ball, a physical medicine and rehabilitation physician, on March 19, 2009.  Defendant's Appx. ¶ 19; Record at 312.  Ellis reported to Dr. Ball that the surgery did not give him "much relief of symptoms[.]"  *Id*.  Dr. Ball discussed "the available options for other management" of his pain and referred him for a facet injection.  *Id*.  On Dr. Ball's referral, Ellis received a facet joint injection from Craig Curry, M.D., on March 25, 2009.  Defendant's Appx. ¶ 20; Record at 314.  Ellis reported that the injection did not offer him relief from his ongoing pain symptoms.  Plaintiff's Appx. ¶ 40; Record at 365.

During visits with Dr. Loiselle on April 2 and 15, 2009, Ellis again complained of pain even though his spine surgery had healed and his physical examination was normal.  Defendant's Appx. ¶ 21; Record at 580-81.  He also "admit[ted] to very poor sleep."  Plaintiff's Appx. ¶ 46; Record at 584.  Dr. Loiselle gave Ellis "literature regarding fibromyalgia" and noted that Ellis read it.  Defendant's Appx. ¶ 21; Record at 580.  After reading the fibromyalgia literature, Ellis was anxious about his future.  *Id*.  Dr. Loiselle prescribed pain medication for him and stated that "we will also have him undergo [a] work place evaluation."  Defendant's Appx. ¶ 21; Record at 581.  Ellis called Unum on April 16 and advised that Dr. Loiselle recommended that he remain out of work until June 3.  Defendant's Appx. ¶ 21; Record at 325.  He reported to Unum that he had started physical therapy at home.  *Id*.

During a follow-up visit with Dr. Ball on April 7, 2009, Dr. Ball suggested that Ellis see Steve McDavid to obtain a "work evaluation" to assess his physical capabilities.  Defendant's Appx. ¶ 22; Record at 365.  Ellis reported to Dr. Ball that "he ha[d] a bunch of other symptoms, including shoulder and elbow pain and pain in the lower extremities."  Defendant's Appx. ¶ 22; Plaintiff's Appx. ¶ 41; Record at 365.  Dr. Ball "wonder[ed] if there is a more systemic issue

11

going on, . . . [because] we are just not making any progress focusing on just the cervical spine."
Defendant's Appx. ¶ 22; Plaintiff's Appx. ¶ 44; Record at 365. She advised that Ellis return to
Dr. Loiselle to discuss this. Record at 365. Ellis agreed to see McDavid. *Id.*

During an April 28, 2009, phone call with Unum Senior Disability Benefits Specialist
Jonathan Dyer, Ellis stated that even though he had healed from surgery, he was still
experiencing the same type of pain he had prior to surgery. Defendant's Appx. ¶ 23; Record at
329, 658. He stated that even if he was found to have the physical capacity to work in his
occupation, he would not return to work because of his persistent pain. *Id.*

In a June 3, 2009, visit with Dr. Loiselle, Ellis continued to complain of aching pain all
over his body, even though his physical examination was normal but for trigger points in his
spine, trapezius, and low back. Defendant's Appx. ¶ 24; Record at 588-89. He reported that he
was dealing with pain issues several years before his spine surgery and managed the pain until he
"could not 'take it anymore[.]'" Defendant's Appx. ¶ 24; Record at 588. He stated that he tried
to do things around the house but could "only work up to 30 minutes without icing" and had
"increasing pain levels to the point of not sleeping the nights that he is active." Plaintiff's Appx.
¶ 47; Record at 588.[6] Dr. Loiselle stated that he "still believe[d] that this [was] a fibromyalgia
pain syndrome" and that Ellis still could not "function at his previous job capacity." Defendant's
Appx. ¶ 25; Record at 580. At Ellis's request, Dr. Loiselle referred him to a rheumatologist. *Id.*

During a June 18, 2009, phone call with Dyer, Ellis stated that he was "no longer going to
be having FCE [functional capacity evaluation] completed." Record at 341. Dyer noted that
"[i]t was determined that because EE [employee, or Ellis] was still having the same pain issues
and discomfort that an FCE would not be appropriate." *Id.* Ellis also told Dyer that he was

---

[6] Unum objected that this statement as originally worded was not supported by the record citation given.
Defendant's Appx. Response ¶ 47. I have reworded it to conform to that citation.

doing his home exercises and "trying to manage the pain with medications" and that "there ha[d] been no change in his symptoms and he still would not be able to perform the physical requirements of his own occupation."  *Id*.[7]

In a July 29, 2009, visit with Dr. Loiselle, Ellis reported that he had no change in his pain levels, which continued to originate at the base of his neck and increased with activity. Defendant's Appx. ¶ 26; Plaintiff's Appx. ¶ 49; Record at 592.[8]  Dr. Loiselle continued to assess him with "myalgias."  Defendant's Appx. ¶ 26; Record at 593.

On August 7, 2009, Unum conducted a roundtable review to "assist [Dyer] in determining next steps for claim at this time."  Defendant's Appx. ¶ 27; Record at 463.  Four Unum employees participated, including Vocational Rehabilitation Consultant Matthew Cunio. *Id*.  The group determined that Ellis's "[o]ccupational requirement[s] include occasional exertion to 50#s, frequent reaching and handling and frequent extension and flexion of neck in all planes."  *Id*.; Plaintiff's Appx. ¶ 9; Record at 15.  The group concluded that Dyer should "proceed with Field visit to ensure consistency in [Ellis's] . . . pain complaints . . . .  Also, will

---

[7] I have avoided the use of both parties' statements characterizing this evidence.  Plaintiff's Appx. ¶ 55; Defendant's Appx. ¶ 25; *see also* Defendant's Appx. Response ¶ 55.  Unum asserts, in relevant part, that Ellis told Dyer that he declined to complete the FCE recommended by Dr. Ball.  Defendant's Appx. ¶ 25.  Ellis asserts, in relevant part, that, at Dr. Ball's recommendation, he was unable to complete the FCE because of his ongoing pain.  Neither assertion is supported by the citation given by both parties to page 341 of the Record.  In his responsive memorandum of law, Ellis also cites pages 462 and 506 of the Record for the proposition that work capacity testing was scheduled but ultimately canceled by Dr. Ball because he was in too much pain to participate.  *See* Plaintiff's Objection to Defendant's Motion for Judgment on the Record ("Plaintiff's Objection") (ECF No. 15) at 7.  Pages 462 and 506 contain an internal notation, evidently authored by Dyer on August 3, 2009, and repeated on August 7, 2009, that "EE did not have formal FCE which was cancelled by Dr. Ball because of EE's ongoing pain issues." Record at 462-63.  However, notes of an August 7, 2009, meeting of four Unum personnel, including Dyer, state, "It is not clear why the EE was unable to participate in the FCE; it is noted he had significant reports of pain; however, . . . it appears his activities are consistent with regular ADLs and exercising including bike riding."  *Id*. at 463.  I disregard Ellis's further statements that (i) he remained in frequent contact with his Unum claims examiners and frequently updated them and (ii) Unum did not pursue the FCE after it had earlier been discouraged by Ellis's physician even though it appeared that Unum never considered that Ellis would have the skills and qualifications to perform a less physically demanding occupation.  Plaintiff's Appx. ¶¶ 54, 59.  As Unum points out, Defendant's Appx. Response ¶¶ 54, 49, neither statement is supported by the citations given.

[8] As Unum notes, Defendant's Appx. Response ¶ 49, Ellis's statement that his pain levels also were unchanged in August 2009 is unsupported by the citation given.

obtain rhe[u]matology consult once completed to better understand primary condition that is causing [Ellis's] reported complaints." Defendant's Appx. ¶ 27; Record at 463.

Unum engaged Crawford & Company to conduct a field visit with Ellis. Defendant's Appx. ¶ 28; Record at 500. The interview took place on August 31, 2009, and lasted for 65 minutes. *Id.* The adjuster, Dan Lacrosse, found that Ellis made "a very good appearance." Plaintiff's Appx. ¶ 57; Record at 500. He noted that Ellis's complaints at that time included neck and back pain, with no relief following surgery. Defendant's Appx. ¶ 28; Record at 502. He advised that Ellis stated that he also suffered from occasional migraines, reportedly postdating his spine surgery. *Id.* He further reported to Unum:

> [Ellis] and his wife and daughter share the household tasks. He does contribute as much as he can due to his wife now working two jobs. He does laundry and vacuuming on a daily basis as needed, but states that he will often have to rest while vacuuming and doing laundry as these tasks do cause increased pain in his neck due to bending etc. . . .
>
> He has a riding lawnmower and does do lawn work for as long as he can tolerate it.
>
> He says he can drive the Blazer short distances, but usually no more than a half hour at a time. After that his legs begin to cramp and his back begins to hurt and he needs to stop and stretch. He will have his daughter or wife drive most of the time as it [is] easier for him to be comfortable in the passenger seat.
>
> He admits to driving his motorcycle on occasions and says that it usually is less stressful on his back than driving a car as he has more freedom of movement. He will occasionally take it for rides that last up to an hour each way, stopping as needed. He does not carry any passengers on these rides.

Plaintiff's Appx. ¶ 58; Defendant's Appx. ¶ 28; Record at 502-03.

On September 28, 2009, Ellis saw Brian Keroack, M.D., of Rheumatology Associates, to whom he had been referred by Dr. Loiselle, for complaints of "[w]idespread musculoskeletal pain, neck pain, [and] back pain." Defendant's Appx. ¶ 29; Record at 533. Dr. Keroack confirmed Dr. Loiselle's diagnosis of fibromyalgia, indicating that Ellis's "Problem #1" was

"Pain threshold disorder – fibromyalgia."  Defendant's Appx. ¶ 29; Plaintiff's Appx. ¶ 50;
Record at 533.  Dr. Keroack noted that "[f]urther mechanical adjustment such as surgery [is] not
going to improve his present symptoms, as his examination is relatively normal for his age."
Defendant's Appx. ¶ 29; Record at 533.  He added, "He clearly has pain well in excess of his
physical findings and has a sleep disturbance and the best clinical fit is fibromyalgia.  *Id*.  Dr.
Keroack reviewed an x-ray of Ellis's spine from February 2009 and noted that the results
reflected an "essentially unremarkable cervical spine."  Defendant's Appx. ¶ 29; Record at 534.

In a letter to Dr. Loiselle, Dr. Keroack stated that Ellis's "pain [was] well in excess of his
physical findings" and that "his examination [was] relatively normal and his pain [was] far
disproportionate to that normal examination."  Defendant's Appx. ¶ 30; Record at 532.

In an October 30, 2009, visit with Dr. Loiselle, Ellis reported that he "continued to
struggle with daily pain, and actually [thought] that he ha[d] more neck pain since the surgery."
Defendant's Appx. ¶ 31; Plaintiff's Appx. ¶ 53; Record at 596.  Dr. Loiselle prescribed
Cymbalta.  Defendant's Appx. ¶ 31; Record at 597.

Unum sent Dr. Loiselle a narrative questionnaire form, which he returned on January 25,
2010.  Defendant's Appx. ¶ 32; Record at 563-68.  He stated that Ellis's current diagnosis was
fibromyalgia and that his restrictions included that he could not lift more than 15 pounds
repeatedly, with "[n]o prolonged standing/sitting."  Defendant's Appx. ¶ 32; Plaintiff's Appx.
¶ 51; Record at 565.[9]  In response to a question regarding the fact that Dr. Keroack had noted
pain complaints well in excess of physical findings, Dr. Loiselle stated, "Fibromyalgia is not 'in
his head.'"  Defendant's Appx. ¶ 32; Plaintiff's Appx. ¶ 48; Record at 566.

---

[9] Unum adds that Dr. Loiselle provided no bases for this opinion.  Defendant's Appx. ¶ 32.  While that is true,
Unum's form did not ask that he do so.  Record at 565-66.

### D.  Unum Performs Medical and Vocational Reviews

On February 5, 2010, Unum Registered Nurse Megan Yeaton conducted a medical analysis of Ellis's treatment history.  Defendant's Appx. ¶ 33; Record at 606-10.  She wrote:

> Fibromyalgia is a condition that is solely based upon reported perceptions of pain and tenderness.  It is based entirely upon reports of pain and the diagnosis is confirmed only after eliciting at least 11 out of 18 specific tender points on examination . . . .  This condition is not generally an impairing one as it should not preclude any but the most strenuous activities.  Patients with fibromyalgia feel pain, but they often have a tendency to avoid activity because of the pain (self limiting behavior), which is the wors[t] thing they can do, as graded exercise is one of the most important treatments of the condition.

Defendant's Appx. ¶ 33; Record at 609.  Yeaton stated that it was "concerning" that Ellis would be required to occasionally lift up to 50 pounds and frequently flex and extend his cervical spine, noting that "[i]t is likely that this activity would be contraindicated because this type motion performed on a frequent basis will likely result in cervical spine issues (instability) at the level below and above the fusion."  Plaintiff's Appx. ¶ 60; Record at 609-10.  She indicated that she needed to discuss this with an orthopedic or physiatry specialist and would defer to the "OSP," presumably a reference to "on-site physician."  *See* Record at 610.

On February 22, 2010, Unum board-certified occupational medicine physician Robert Gaetjens, M.D., reviewed and summarized Ellis's medical records and reviewed other material in the file such as the field visit report.  Defendant's Appx. ¶ 34; Record at 614-21.  Dr. Gaetjens was asked whether the medical evidence supported Ellis's inability to perform "occasional exertion up to 50#s, frequent reaching and handling and frequent extension and flexion of the cervical spine in all planes[.]"  Defendant's Appx. ¶ 34; Record at 620.  He responded:

> There is no support that the Claimant would be precluded from performing the above-noted physical job demands.  There are scant physical exam findings in the office notes of . . . Dr. Loiselle to corroborate the Claimant's claimed level of impairment.  The physical findings included in the office notes of . . . Drs. Keroack and Loiselle note no synovitis or swelling, and trigger points whose

location is noted but are lacking quantification of the amount of trigger points or if they are greater than 11/18 to meet the American College of Rheumatology's Diagnosis Criteria for fibromyalgia. The office notes of . . . Dr. Keroack . . . note the Claimant's physical exam findings to be within normal limits and his pain is far disproportionate to his normal examination. . . . Dr. Keroack opined fibromyalgia and found that he really had nothing further to offer him. Physical exam findings were noted to be within normal limits. He did document multiple areas of tenderness throughout the examination but did not document these as trigger points.

*Id.* In response to the question whether, if the answer to the foregoing question was no, the medical data supported the restrictions and limitations imposed by Dr. Loiselle, Dr. Gaetjens stated:

The R&Ls [restrictions and limitations] of . . . Dr. Loiselle are more restrictive than would be expected after review of the medical data. The Claimant again is noted to be taking Aleve, Lyrica and Cymbalta for his muscle pain complaints and appears to be maintained on less medication than would appear necessary by his stated severity of pain. The Field Visit . . . notes the Claimant able to drive, use a riding lawn mower, drive a motorcycle for one hour in each direction and do laundry and vacuuming at home. The Claimant's current level of function is clearly in excess of the R&Ls of . . . Dr. Loiselle . . . . There are no R&Ls opined by . . . Dr. Barth for the Claimant's neck complaints since he was released from treatment on 6/09. The diagnosis of fibromyalgia would not preclude working with the above-noted physical job demands. . . . Dr. Keroack . . . has not opined R&Ls. Again, while he did confirm the diagnosis of fibromyalgia he did not opine impairment or R&Ls related to this diagnosis.

*Id.*[10]

Dr. Gaetjens called Dr. Loiselle on February 26, 2010. Defendant's Appx. ¶ 35; Record at 622. Dr. Loiselle confirmed that Ellis's pain was out of proportion to any physical findings and that the majority of his complaints were subjective since he looked healthy. Defendant's Appx. ¶ 35; Record at 628. His condition had not changed in the last year. Defendant's Appx. ¶ 35; Record at 622. Dr. Loiselle stated that Ellis "was not able to be employed in his prior occupation." *Id.* Dr. Gaetjens noted that following the conversation, Dr. Loiselle had "not

---

[10] I disregard Ellis's statement characterizing this evidence. Plaintiff's Appx. ¶ 61. As Unum points out, Defendant's Appx. Response ¶ 61, it is not supported by the citation given.

provided any new information regarding the claimant's R&Ls and we are in continued disagreement with him." *Id*. He added that Dr. Loiselle had "not changed my prior opinion regarding [Ellis's] functional abilities to perform his physical job demands." *Id*.

Dr. Gaetjens wrote a letter to Dr. Loiselle dated February 26, 2010, documenting their conversation and stating:

> If you agree that this accurately represents our conversation, there is no need to reply. If you feel that any corrections, additions or deletions are needed, you can notate the letter and fax or you can dictate and fax a longer reply . . . . We are happy to receive a reply from you at any time.

Defendant's Appx. ¶ 35; Record at 628. On March 3, 2010, Dyer called Dr. Loiselle's office and left a message inquiring whether Dr. Loiselle agreed with Dr. Gaetjens' letter. Defendant's Appx. ¶ 36; Record at 651. Dr. Loiselle's nurse returned the call the next day and "stated that the letter accurately captures" Dr. Loiselle's opinion. Defendant's Appx. ¶ 36; Record at 661.

Dr. Gaetjens referred the file to Norman Bress, M.D., a board-certified rheumatologist and internist, for a second-level medical review. Defendant's Appx. ¶ 37; Record at 631-37. After reviewing all of Ellis's medical records, the field visit report, and Dr. Gaetjens' review, Dr. Bress completed a report dated March 2, 2010, in which he concurred with Dr. Gaetjens' opinions. *Id*. Dr. Bress reasoned that, despite Ellis's pain complaints, he was able to remain active around his house, performing chores, and was able to drive his vehicle and motorcycle. Defendant's Appx. ¶ 37; Record at 635-36. He noted:

> [S]tudies published in the medical literature reveal that the majority of patients with [fibromyalgia] are able to work full time in their usual occupation. One of the most important parts of treatment of patients with [fibromyalgia] is a physical therapy program, with emphasis on reconditioning. The goal is to return the patient to normal vocational and avocational activities as soon as possible.

Defendant's Appx. ¶ 37; Record at 636. Dr. Bress found "nothing unusual or atypical about [Ellis's fibromyalgia] to preclude this." *Id*. He also noted:

[T]here is no evidence of a connective tissue disease.  Joint exams have been consistently normal.  Neurologic exams have also been consistently normal, with no evidence of muscle weakness.  It is therefore my opinion that the claimed restrictions and limitations are not supported on the basis of the insured's [fibromyalgia] symptoms.

There are minimal physical findings with regard to the insured's cervical spine and neurologic exams have not revealed any abnormality.  It is noted that Dr. Loiselle does not mention any diagnosis concerning the cervical spine in his response dated 11/16/2009.  It is therefore my opinion that the insured's cervical spine status does not support the claimed restrictions and limitations.

Taking into consideration the insured's [fibromyalgia] and cervical spine condition, it is my opinion, in agreement with . . . Dr. Gaetjens, that "the record does not demonstrate findings that would preclude the Claimant from performing occasional exertion up to 50 lbs, frequent reaching and handling, and frequent extension and flexion of the cervical spine in all planes.  The R&Ls of . . . Dr. Loiselle are more restrictive than would be expected after reviewing the medical data.

*Id.*[11]

On March 3, 2010, Dyer referred the file for an additional vocational consultation with Cunio, an Associate Vocational Rehabilitation Consultant, in order to "determine the material and substantial duties and physical demands of the claimant's occupation in the national economy."  Defendant's Appx. ¶ 38; Record at 645-46.  Dyer specifically referred to the August 7, 2009, roundtable review that found that Ellis's occupation required "occasional exertion to 50 #s, frequent reaching and handling and frequent extension and flexion of neck in all planes."  *Id.*

Cunio reviewed the field visit report, materials from Pape describing Ellis's job, and the Dictionary of Occupational Titles ("DOT").  Defendant's Appx. ¶ 39; Record at 646, 649-50. He noted Ellis's report that "he worked on all types of vehicles but was especially trained on

---

[11] I disregard Ellis's statement characterizing Dr. Bress' report.  Plaintiff's Appx. ¶ 62.  As Unum points out, Defendant's Appx. Response ¶ 62, while Dr. Bress found that Ellis fit the criteria for the diagnosis of fibromyalgia, he also noted that there was no evidence that Ellis was examined for fibromyalgia control points and/or that an examination was performed under distraction, Record at 636.

heavy trucks." Defendant's Appx. ¶ 39; Record at 646. He also noted that Ellis had documented on "the 03/09/2009 [employment history] that he was employed as a 'Mechanic'" and that Ellis had attached a typewritten document indicating that he performed duties of "[s]ervicing, diagnosing, repairing any and all systems on vehicles be it engine related, electrical related, drive train related etc." *Id.* Cunio stated:

> Upon review of the claim file information identified above, given the documentation and verbal report that the claimant was a mechanic/service technician for vehicles with duties to service, diagnose, and repair vehicle systems; I can say with a reasonable degree of vocational certainty that, in agreement with the statement made in the 08/07/2009 Round-table Review, the claimant's occupation in the national economy is most consistent with Automobile Mechanic, DOT Code 620.261-010.

Defendant's Appx. ¶ 39; Record at 647. Cunio listed the specific material and substantial duties of an Automobile Mechanic in the national economy, as well as the physical demands associated with those duties. Defendant's Appx. ¶ 40; Record at 647-49. Those physical demands included the ability to lift, carry, push, and pull up to 50 pounds occasionally, up to 25 pounds frequently, and up to 10 pounds constantly. Defendant's Appx. ¶ 40; Record at 648. Likewise, Ellis had to be able to stand and/or walk and reach and handle frequently. *Id.* He had to be able to stoop, kneel, crouch, and crawl occasionally and to frequently extend and flex his neck in all planes. Defendant's Appx. ¶ 40; Record at 648-49. "Occasionally" means up to 2.5 hours in a workday; "frequently" means up to 5.5 hours in a workday; and "constantly" means more than 5.5 hours in a workday. Defendant's Appx. ¶ 40; Record at 649.

### E.  Unum Terminates Ellis's LTD Benefits

Based on all of the information in the file, Dyer concluded that Ellis no longer met his burden of establishing disability. Defendant's Appx. ¶ 41; Record at 662. On March 4, 2010, he drafted a letter explaining the bases for that decision. *Id.* He asked Unum quality control

specialist Peter Milne to review it, and Milne stated that he agreed with Dyer's decision and letter. *Id*.

On March 4, 2010, Dyer called Ellis to advise him of Unum's determination. Defendant's Appx. ¶ 42; Record at 663. Dyer explained that Unum based its decision on the opinions of two doctors. *Id*. Ellis "asked about the new fibro[myalgia] diagnosis, [and Dyer] explained that it was determined that it does not rise to a level of severity that would preclude him from [his own] occupation." *Id*. Dyer advised Ellis of his right to appeal and mentioned that a letter explaining the decision would be forthcoming. *Id*.

By letter dated March 4, 2010, Dyer informed Ellis that Unum had determined that he was no longer disabled from performing the material and substantial duties of his own occupation and, therefore, effective as of that date, no further benefits were payable on his claim. Defendant's Appx. ¶ 43; Plaintiff's Appx. ¶ 63; Record at 653-54. Dyer explained that the reviews of Drs. Gaetjens and Bress determined that "there is no support that you would be precluded from performing the above noted physical occupation demands." Defendant's Appx. ¶ 43; Record at 654. He stated:

> Your physical findings included in the office notes of Dr. Keroack and Dr. Loiselle note no synovitis or swelling, and trigger points whose location is noted but are lacking quantification of the amount of trigger points or if they are greater than 11/18 to meet the American College of Rheumatology's Diagnosis Criteria for fibromyalgia. The office notes of Dr. Keroack . . . note that your physical exam findings are within normal limits and your pain is far disproportionate to your normal examination. Dr. Keroack opined fibromyalgia and found that he had nothing further to offer you. Physical exam findings were noted to be within normal limits. . . . You are noted to be taking Aleve, Lyrica and Cymbalta for your muscle pain complaints and appear to be maintained on less medication than would appear necessary by your stated severity of pain. During the field visit . . . it was noted that you are able to drive, use a riding lawn mower, drive a motorcycle for one hour in each direction and do laundry and vacuuming at home. Your current level of function is clearly in excess of the restrictions and limitations provided by Dr. Loiselle. In conclusion it was determined that you

have the capacity to perform the physical requirements of your own occupation as
defined above.

*Id*. Dyer indicated that the second physician reviewer had "determined that even with taking into

consideration your fibromyalgia and cervical spine conditions the records do not[] demonstrate

findings that would preclude you from performing occasional exertion up to 50 pounds, frequent

reaching and handling, and frequent extension and flexion of the cervical spine in all planes."

Record at 655.

Dyer informed Ellis of his right to appeal Unum's decision.  Defendant's Appx. ¶ 44;

Record at 656-57.  Dyer stated that if Ellis chose to appeal, he must "submit a written letter of

appeal outlining the basis for [his] disagreement."  Defendant's Appx. ¶ 44; Record at 656.  He

invited Ellis to include any additional information he would like considered, which might include

"written comments, documents, or other information in support of [his] appeal."  *Id*.  He

informed Ellis that, upon his written request, Unum would provide him "with all documents,

records and other information relevant to [his] claim for benefits."  Defendant's Appx. ¶ 44;

Record at 657.

On March 9, 2010, Ellis phoned Dyer and asked for a copy of Unum's claim file to aid in

his appeal of the decision.  Defendant's Appx. ¶ 45; Record at 668.  Unum mailed the documents

to Ellis on March 10, 2010.  Defendant's Appx. ¶ 45; Record at 669.

**F.  Unum Upholds Decision on Appeal**

By letter dated March 9, 2010, Ellis appealed Unum's determination.  Defendant's Appx.

¶ 46; Plaintiff's Appx. ¶ 66; Record at 676.  He wrote, in relevant part:

Due to the sudden termination of benefits, I feel it is in my best interest to appeal
the decision made by UNUM to deny me any further benefits.  After reviewing
the letter that was sent to me and received on March 8, 2010, I dispute several of
the findings listed in the letter.

22

> I am requesting a copy of the job description that the Vocational Rehabilitation Consultants used to determine their findings for a commercial truck mechanic and not a service technician.  There is a significant difference between the two occupations and it appears by the definition that was given in the letter that the consultants do not have an accurate or fair description.

Defendant's Appx. ¶ 46; Record at 676.

Unum Lead Appeals Specialist Bryan Cheever attempted to call Ellis on March 18, 2010, to discuss the appeal but noted that the number on file had been disconnected.  Defendant's Appx. ¶ 47; Record at 680.  He sent Ellis a letter dated March 18, 2010, in which he stated:

> [I]t is not clear from your appeal letter whether you wish to have additional information reviewed in support of your appeal . . . .  Accordingly, we ask that you . . . contact us to confirm whether you wish to submit additional information in support of your appeal or if, alternatively, you wish for us to obtain additional medical records on your behalf.

Defendant's Appx. ¶ 47; Record at 682.

In a follow-up phone call, Ellis stated that he had not seen Dr. Keroack but continued to see Dr. Loiselle.  Defendant's Appx. ¶ 48; Record at 685.  He agreed to provide an updated authorization to enable Unum to obtain updated records from Dr. Loiselle.  *Id*.

On March 25, 2010, Unum requested updated medical records from Dr. Loiselle. Defendant's Appx. ¶ 49; Record at 690-91.  On April 2, 2010, Unum received updated medical records from Dr. Loiselle.  Defendant's Appx. ¶ 49; Record at 696.  The records reflected that Ellis saw Dr. Loiselle on March 17, 2010, and continued to report that his pain levels were high. Defendant's Appx. ¶ 49; Record at 699-701.  Dr. Loiselle described him as a "[p]atient with cervical pain, [status-post] cervical fusion, without alleviation of his pain" and with "[p]ain out of proportion to examination" and noted that he had been "trialed on Elavil, lyrica, cymbalta, and

sertraline without effect." Plaintiff's Appx. ¶ 52; Record at 699.[12] Apart from noted trigger points, his physical examination was normal, and he was "well-appearing." Defendant's Appx. ¶ 49; Record at 700-01. He continued to be diagnosed with fibromyalgia. Defendant's Appx. ¶ 49; Record at 701. Dr. Loiselle noted "no new findings" and stated that he still did "not believe that [Ellis] would be able to return to his previous employment as a heavy truck mechanic[.]" *Id.*

Ellis called Cheever on April 14, 2010. Defendant's Appx. ¶ 50; Record at 711. He "noted his disagreement with the identification of his [occupation] and stated that there is a big difference [between] a 'truck mechanic', which he is, and a 'car mechanic.'" *Id.* Cheever "ack[nowledged] [Ellis's] statement and explained that [Unum] ha[d] referred [the] file to voc[ational] staff in appeals so that they can review." *Id.* Cheever "also explained [Unum's] need, per the policy applicable to [Ellis's] claim, to assess his occ[upation] as it is normally performed in the national economy." *Id.* Ellis "stated that he understood." *Id.*

On April 14, 2010, Cheever requested a vocational review to address Ellis's concern regarding the vocational staff's assessment of his occupation. Defendant's Appx. ¶ 51; Record at 719. He stated: "Please review and confirm whether those findings are accurate." *Id.*

Unum Senior Vocational Rehabilitation Consultant Richard Byard, who holds both Juris Doctor and Master of Science degrees, reviewed the occupational information in the file, including Pape's job description and Ellis's description of his duties. Defendant's Appx. ¶ 52; Record at 719-20. Byard concluded that Ellis's occupation most closely corresponded to an Automobile Mechanic, which calls for a medium level of physical exertion. Defendant's Appx.

---

[12] Unum objected that this statement as originally worded was not supported by the record citations given. Defendant's Appx. Response ¶ 52. I have reworded it.

¶ 52; Record at 720.  Byard stated that Ellis would be required to engage in "frequent standing and/or walking as well as the occasional lifting/exertion of force of up to 50 lbs."  *Id.*  He added that, "[w]hile duly noting the claimant's Job Description references to lifting/moving requirements in excess of the 50 lb. level, we would consider these to be specific to the claimant's position with [Pape] and not necessarily representative of the manner in which the claimant's overall occupation is performed."  *Id.*

On April 14, 2010, Cheever also referred the file for a clinical review.  Defendant's Appx. ¶ 53; Record at 716.  He posed the following questions to the reviewer: "Do claimant's medical records validate/support functional restrictions (what one should not do) or limitations (what one cannot do) beyond 3/7/10?"  *Id.*  "If so, please identify those restrictions and/or limitations, the expected duration for them, and the condition(s) causing them."  *Id.*

Unum Senior Clinical Consultant and Registered Nurse Bradford Stuman reviewed and summarized Ellis's medical records.  Defendant's Appx. ¶ 54; Record at 723-26.  He concluded that, although Ellis's fibromyalgia diagnosis might warrant some degree of restrictions and limitations, Ellis "would not be precluded from all physical activity."  Defendant's Appx. ¶ 54; Record at 726.

Charles Sternbergh, M.D., a Unum board-certified neurosurgeon, reviewed the file on April 29, 2010.  Defendant's Appx. ¶ 55; Record at 730-33.  He was asked, "[d]o claimant's medical records validate/support functional restrictions (what one should not do) or limitations (what one cannot do) beyond 3/7/10?"  Defendant's Appx. ¶ 55; Record at 732.  He answered:

> Claimant underwent single segment [spine surgery] in 11/08 without surgical complications and documented bone healing.  Radicular symptoms resolved, but claimant complained of multicentric myofascial pain without evidence of anatomic or physiological abnormalities.  The symptoms were treated symptomatically with [a] variety of medication.  After reviewing all of the available medical information, it is my opinion, to a reasonable degree of medical

25

> certainty, that claimant can sustain full-time medium work activities with a lifting
> limitation of 50 pounds occasionally.  These R&Ls are valid from 3/7/10 to the
> present day.

Defendant's Appx. ¶ 55; Record at 732-33.  Dr. Sternbergh further noted that Ellis "participates

in a full array of homemaking activities and lawn care" and "operates a motor vehicle and

motorcycle[,]" and that "[t]his extent of physical activity as well as the absence of anatomic or

physiological abnormalities would support my opinion that he is able to sustain medium work

activities."  Defendant's Appx. ¶ 55; Record at 733.

On May 10, 2010, Cheever sought a quality-control review of his decision to deny Ellis's

appeal.  Defendant's Appx. ¶ 56; Record at 734.  Unum's Matthew Roop reviewed a draft of

Cheever's letter.  *Id.*

By letter dated May 11, 2010, Cheever informed Ellis that Unum affirmed its decision

that he was no longer disabled from performing his own occupation.  Defendant's Appx. ¶ 57;

Plaintiff's Appx. ¶ 67; Record at 737-40.  Cheever chronicled Ellis's treatment and summarized

the medical review performed by Dr. Sternbergh, who "found that given the absence of any

anatomic or physiological abnormalities along with the extent of physical activity documented in

your file, it is reasonable to conclude that you were able to sustain full-time medium work from

March 7, 2010 forward."  Defendant's Appx. ¶ 57; Record at 738-39.  Cheever also described

Unum's vocational analysis and addressed Ellis's argument that Unum did not correctly identify

the physical demands of his occupation:

> The occupational duties that you were performing prior to going out of work are
> most consistent with those performed in the Automobile Mechanic occupation
> (DOT Profile# 620.261-010).  As generally performed, this occupation calls for a
> medium level of physical exertion, meaning that it requires one to frequently
> stand and/or walk and to occasionally lift and/or exert force of up to 50 pounds.
> While the job description submitted by your employer references a lifting/moving
> requirement in excess of 50 pounds, this requirement is specific to your particular

position with your employer and it is not necessarily representative of how your regular occupation is normally performed in the national economy.

Pursuant to the policy applicable to your claim, in order for you to have remained eligible for benefits beyond March 7, 2010, you had to have been disabled from performing the material and substantial duties of your regular occupation as it is normally performed in the national economy.  Based on the findings documented above by our medical and vocational staff, we have determined that when your benefits were discontinued, you were able to perform the material and substantial duties of your regular occupation as it is normally performed in the national economy.  Accordingly, you were then no longer eligible for benefits and we must therefore uphold the Benefit Center's original decision to discontinue your benefits on March 7, 2010.

Defendant's Appx. ¶ 57; Record at 739.[13]

## III. Discussion

The parties cross-move for judgment on the record on Ellis's one-count complaint for recovery of plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).  *See* Plaintiff's Motion at 1; Defendant's Motion at 1; Complaint ¶¶ 21-23.   Ellis alleges that, despite his continued entitlement to disability benefits under the terms of the Policy, Unum improperly terminated his benefits.  *See* Complaint ¶ 23.

Specifically, Ellis contends that (i) Unum arbitrarily terminated his benefits by choosing to rely on a conflicting, less demanding job description and the opinions of two physicians who never examined him, and, (ii) although Unum did not reach the issue, there is sufficient evidence in the record for the court to conclude that he lacks the capacity to perform the duties of any gainful occupation for which he is reasonably fitted by education, training, or experience, as a

---

[13] I disregard Ellis's statements that (i) he continues to experience debilitating pain that consistently limits his ability to perform any activity for any prolonged length of time, and (ii) he has continued to seek treatment with Dr. Loiselle, who remains of the opinion that he is unable to perform his previous occupation.  Plaintiff's Appx. ¶¶ 64-65.  As Unum points out, Defendant's Appx. Response ¶¶ 64-65, these statements are unsupported by the citations given.

result of which he is entitled to retroactive disability benefits for the period from February 7, 2011, to the present date.  *See* Plaintiff's Motion at 11-23.

Unum argues that, following a full and fair review, it correctly determined that Ellis failed to meet his continuing burden of proving disability, given that (i) its vocational determination was essentially undisputed in the record, (ii) it relied on substantial medical evidence to conclude that Ellis had fallen short of demonstrating that he could not meet the demands of his occupation as usually performed in the national economy, and (iii) this is not a case in which the so-called "structural conflict of interest" carries any weight in analysis of whether its decision was arbitrary or capricious.  *See* Defendant's Motion at 13-21.

I conclude that Unum's findings as to both (i) the physical demands of Ellis's occupation as it is normally performed in the national economy and (ii) his ability to meet those demands despite his diagnosis of fibromyalgia and ongoing pain complaints are reasoned and supported by substantial evidence.  Accordingly, I recommend that the court find that Unum did not arbitrarily discontinue his LTD benefits.  Should the court agree, that is dispositive of Ellis's claim and moots his argument that he was also disabled from performing the duties of any gainful occupation.  In any event, as Unum notes, *see* Defendant's Objection to Plaintiff's Motion for Judgment on the Record ("Defendant's Objection") (ECF No. 16) at 2, if the court had occasion to reach the latter point, remand for decision in the first instance by the plan administrator would have been the proper remedy, *see, e.g., Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) (remedy of remand to plan administrator was appropriate in case in which the evidence did not compel the conclusion that the claimant was entitled to benefits); *Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 24 (1st Cir. 2003) ("Even where *de novo* review exists under ERISA, it is at least doubtful that courts should be in any

28

hurry to consider evidence or claims not presented to the plan administrator. . . .  Where as here review is under the arbitrariness standard, the ordinary question is whether the administrator's action on the record before him was unreasonable.").[14]

## A. Classification of Job

Ellis complains that Unum arbitrarily relied on "a standardized definition for automobile mechanic which differed widely from the actual work" he performed as well as from "the job description provided by his former employer[.]"  Plaintiff's Motion at 17.  He contends that, while the Policy does provide that Unum will look at a claimant's occupation as normally performed in the national economy, the First Circuit has held that, to be applicable, standardized job descriptions must involve duties comparable to a claimant's actual job responsibilities.  *See id*. at 3 n.1 (citing *Tsoulas v. Liberty Life Assurance Co. of Boston*, 454 F.3d 69, 78 (1st Cir. 2006)).   He argues that, while the definition used by Unum does contain comparable requirements for reaching, extension, and flexion, the 50-pound lifting requirement "grossly mischaracterizes the type of lifting that [he] would have been required to do as part of his essential functions as a service technician specializing in heavy trucks[,]" *id*., noting that Pape described his job as requiring occasional lifting and/or moving of up to 100 pounds, *see id*. at 2-3.

As Unum counters, *see* Defendant's Objection at 3, all of its vocational reviewers found that Ellis's job, as described by himself and Pape, most closely matched the job of Automobile Mechanic as it is normally performed in the national economy, *see* Record at 463, 645-50, 719-

---

[14] Ellis points out, "[i]n an abundance of caution," that Unum's counsel took the position during negotiations in this case that the "self-reported symptoms clause" in the Policy might apply and limit Ellis's benefits, although Unum did not deny or limit his benefits on that basis.  *See* Plaintiff's Motion at 12 n.2.  He argues that this clause is inapposite in his circumstances.  *See id*.  Unum does not press the "self-reported symptoms clause" as a basis on which the court should uphold its termination of Ellis's benefits, noting that, for purposes of an ERISA claim, a court cannot review a determination that an administrator has yet to make.  *See* Defendant's Objection at 2.

20.   That constitutes substantial – indeed, undisputed – evidence.   Nothing in *Tsoulas*
undermines the reasonableness of that finding.   In *Tsoulas*, the relevant policy language did not
define the term "occupation."   *See Tsoulas*, 454 F.3d at 78.   After contacting the claimant to
obtain a description of her job duties, the insurer relied on a DOT job description in assessing
whether she was able to perform the material and substantial duties of her occupation.   *See id*.
The First Circuit held that, "[i]n this situation, we adopt the Fourth Circuit's reasoning that a
general job description of the DOT, to be applicable, must involve comparable duties but not
necessarily every duty."   *Id*. (citation and internal punctuation omitted).

In this case, by contrast, the Policy specified that Unum would "look at your occupation
as it is normally performed in the national economy, instead of how the work tasks are
performed for a specific employer or at a specific location."   Record at 93.   The question
presented, therefore, was not whether the DOT job description reasonably reflected Ellis's job as
actually performed, but whether it reflected Ellis's job as it is normally performed in the national
economy.   There is substantial evidence of record that it did.

## B.  Reliance on Non-Examining Physicians

Ellis also faults Unum's reliance on the opinions of non-examining physicians in
determining that he no longer was disabled as of March 4, 2010.   *See* Plaintiff's Motion at 13.
He observes that the Supreme Court has noted that "[p]lan administrators . . . may not arbitrarily
refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."
*Id*. (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).   He argues that,
while *Black & Decker* also holds that the opinions of treating physicians are not entitled to
special deference under ERISA, this court has observed that "reason dictates that the assessment
of an impartial physician who has actually examined a particular patient is likely to be more

reliable than the assessment of an equally impartial physician who has only reviewed the paper file." *Id.* at 13-14 (quoting *Black v. Unum Life Ins. Co. of Am.*, 324 F. Supp.2d 206, 216 n.8 (D. Me. 2004)). *See also* Plaintiff's Objection at 3-4 (relying on *Colby v. UnumProvident*, 328 F. Supp.2d 186, 191-92 (D. Mass. 2004), for proposition that Unum arbitrarily and capriciously refused to credit Ellis's reliable evidence while crediting the biased, second-hand opinions of its hired physicians).

He asserts that (i) he had an excellent work history prior to his surgery, (ii) none of his treating physicians has suggested that he is a malingerer or is exaggerating his symptoms for gain, and (iii) no treating physician has stated that he can return to his job as a heavy truck mechanic. *See* Plaintiff's Motion at 21-22. Instead, he contends, Drs. Barth, Ball, Loiselle, and Keroack "are uniform in their opinions that he cannot." *Id.* at 22.

In any event, he asserts, even if Unum's reliance on non-examining physicians was reasonable, the decision to terminate benefits nonetheless was arbitrary and capricious for at least two reasons: that Unum wrongly called into question the validity of his fibromyalgia diagnosis and gave undue weight to activities of daily living that did not evidence an ability to return to the demands of his former occupation, either as described by Pape or set forth in the DOT. *See id.* at 14-23.

As to the first point, he contends that, in its March 4, 2010, denial letter, Unum questioned the sufficiency of the physical findings in the record to corroborate his claimed level of impairments and asserted that there was insufficient quantification of claimed trigger points for fibromyalgia. *See id.* at 14.[15] He argues that, because the symptoms of fibromyalgia are

---

[15] "Fibromyalgia is characterized by chronic and frequently difficult to manage pain in muscles and soft tissues surrounding joints." *Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 218 (1st Cir. 2010) (citation and internal quotation marks omitted). "A patient may be diagnosed with fibromyalgia if she has (1) a history of (*continued on next page*)

subjective, most courts have held it unreasonable to require that a long-term disability claimant provide "convincing clinical evidence" to support his condition. *Id.* (quoting *Burchill v. Unum Life Ins. Co.*, 327 F. Supp.2d 41, 51 (D. Me. 2004)).   He asserts that, while Unum's hired physician (Dr. Gaetjens) may have questioned the sufficiency of the fibromyalgia diagnosis, Drs. Loiselle and Keroack both diagnosed fibromyalgia, and Dr. Bress felt that Ellis met its clinical criteria. *See id.* at 16.   He points out that Unum never requested that he undergo examination by one of its staff physicians to substantiate his diagnosis of fibromyalgia. *See id.* at 16-17.

As to the second point, he argues that, although Unum's physicians relied heavily on his reported level of activity, nothing in the record corroborates "that there is any reasonable correlation between [his] ability to do some occasional vacuuming and mowing and his ability to lift and install heavy truck parts for 40 hours a week as required by his regular occupation." *Id.* at 17.   He asserts that his household activities were isolated, limited events, accomplished with frequent breaks that would not be permitted in a full-time work environment and accompanied by step-ups in pain levels. *See id.* at 18-19.

He contends that, because Unum's physicians never interviewed him or performed any functional analysis of his capacities, they had no basis upon which to conclude that he was able to perform the material and substantial duties of his regular occupation or to discredit his accounts of his disabling limitations or those of every physician who had treated him. *See id.* at 17-18.   He notes that at least one of Unum's own reviewers, Yeaton, raised serious concerns about the impact that the heavy lifting required in his occupation would have on the continued stability of his cervical spine. *See id.* at 19-20.

---

widespread pain for at least three months and (2) pain in at least eleven out of eighteen tender point sites upon digital palpation." *Id.* (citation omitted).   "Symptoms of fibromyalgia can include stiffness, fatigue, and disturbed sleep." *Id.* (citation omitted).

Ellis quotes several cases in support of the proposition that Unum arbitrarily and capriciously relied on the opinions of paper-file reviewers who placed undue weight on sporadic activities of daily living: *Wilson v. Life Ins. Co. of N. Am.*, 424 F. Supp.2d 1146, 1157 n.6 (D. Neb. 2006) ("Nothing in the record comes close to establishing that [the claimant's] activities of daily living could reasonably be equated with the demands of a full-time job."); *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007) ("conclusory and unsupported statements that the documentation of [the claimant's] functional capacity was insufficient to support a finding of disability" were not enough to uphold a denial of LTD benefits); and *Black*, 324 F. Supp.2d at 216 (Unum unreasonably relied on non-treating physician's review "while ignoring (without explanation) the other medical information contained in the administrative record that overwhelmingly suggested that [the claimant's] condition had not improved to the extent that he could perform the material duties of his occupation."). *See id.*[16]

I turn first to Ellis's overarching assertion that Unum erred in crediting the opinions of non-treating, non-examining consultants over those of a treating physician or physicians. As

---

[16] Ellis also asserts, in response to Unum's argument that this is not a case in which the so-called "structural conflict of interest" carries any weight, that the court should factor that conflict into its analysis. *See* Defendant's Motion at 18-21; Plaintiff's Objection at 5-6. As Unum notes, *see* Defendant's Motion at 18, the claimant bears the burden of showing that a structural conflict, which exists when the same entity that makes claims decisions pays benefits, influenced the administrator's decision, *see Cusson*, 592 F.3d at 225. Ellis does not raise the point in his own cross-motion. *See generally* Plaintiff's Motion; Defendant's Objection at 15-16 n.14. In his objection to Unum's motion, he argues that Unum's denial letter questioning the validity of his fibromyalgia diagnosis, its arguments on this appeal, and certain statements of its medical reviewers, for instance, that fibromyalgia is not typically disabling, betray a bias to deny fibromyalgia claims. *See* Plaintiff's Objection at 5-6. He asserts that, as a result of that bias, he never was evaluated as an individual with particularized, specific medical symptoms. *See id.* at 5. Yet, the record reflects that Drs. Gaetjens, Bress, and Sternbergh, and ultimately Unum, took Ellis's particularized circumstances into account, concluding that, even accepting the diagnosis of fibromyalgia, he had not shown that he was physically incapable of returning to his occupation as normally performed in the national economy. In the circumstances, Ellis falls short of demonstrating that Unum's structural conflict led to a bias against fibromyalgia claimants that caused or contributed to its decision to terminate his LTD benefits. *See Cusson*, 592 F.3d at 226-27 (rejecting argument that paper-file reviewers' reports were unreliable in circumstances in which reviewers questioned the effect of fibromyalgia on a claimant's ability to work, not the validity of the diagnosis); *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 (1st Cir. 2003) (rejecting argument that paper-file reviewer's skepticism as to validity of diagnoses betrayed prejudice when reviewer's central point was that, even if diagnoses were established, claimant's physical abilities were not so diminished as to prevent her from performing the duties of her own or any similar occupation).

Unum points out, *see* Defendant's Objection at 6 n.3, it did not reject the uniform opinions of four treating physicians (Drs. Barth, Ball, Loiselle, and Keroack) that Ellis was unable to return to his work as a heavy truck mechanic (which, in any event, was Ellis's description of his job as actually performed).  For the relevant period, after Ellis healed from his neck surgery, only Dr. Loiselle expressed that opinion.

The fact that Unum chose to credit the opinions of its three board-certified reviewers, Drs. Gaetjens, Bress, and Sternbergh, over that of a treating physician, Dr. Loiselle, does not render its decision arbitrary or capricious.[17]   The Supreme Court has rejected the so-called "treating physician rule," holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker*, 538 U.S. at 834 (footnote omitted).

The Supreme Court acknowledged that it might be true that treating physicians, as a rule, have a greater opportunity to know and observe a claimant than a consultant retained by a plan, and that plan consultants might have an incentive to find claimants not disabled to save their employers money and preserve their own consulting arrangements.  *See id.* at 832.  Yet, it noted, "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"  *Id.*

Applying *Black & Decker*, the First Circuit has deemed a claimant's argument that an insurer engaged in selective review of the evidence "unavailing."  *Tsoulas*, 454 F.3d at 77.  The

---

[17]  While Unum's nurse reviewer Yeaton raised a concern about Ellis's ability to occasionally lift up to 50 pounds in the wake of his spinal fusion surgery, she did not express an opinion that he lacked the capacity to do so.  *See* Record at 609-10.  She deferred to the opinion of the on-site physician.  *See id.* at 610.

34

court observed, "it is not for a court to determine precisely how much weight an insurer should have accorded a particular piece of evidence in its overall decision." *Id.* (citation and internal punctuation omitted). That a claimant has fibromyalgia, which "is diagnosed primarily based on a patient's self-reported pain symptoms[,]" does not dictate the acceptance of a treating physician's opinion, or the rejection of that of a non-examining reviewing physician, as to the limitations imposed by that disease. *Cusson*, 592 F.3d at 226-27 (finding no impropriety in insurer's reliance on paper-file reviewers' conclusions regarding impact of fibromyalgia on claimant's ability to work; noting, "This court draws a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition such as fibromyalgia that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed.") (citation and internal punctuation omitted).[18]

Nor was Unum's decision arbitrary and capricious for the specific reasons identified by Ellis.

<u>First</u>, Unum disputes that it challenged Ellis's diagnosis of fibromyalgia. *See* Defendant's Objection at 10. It asserts that, while it quoted a portion of Dr. Gaetjens' report observing that the medical records lacked quantification of trigger points, Dr. Gaetjens did not

---

[18] While, in *Black*, this court stated that "reason dictates that the assessment of an impartial physician who has actually examined a particular patient is likely to be more reliable than the assessment of an equally impartial physician who has only reviewed the paper file[,]" that case was decided pursuant to a *de novo* standard of review. *Black*, 324 F. Supp.2d at 216 n.8. The *Black* court observed that when, as here, the standard of review is deferential, "it is not appropriate for the Court to determine precisely how much weight a plan administrator should have given to different evidence within the administrative record." *Id.* (citation and internal quotation marks omitted). Moreover, the *Black* court acknowledged that, even as to cases decided on *de novo* review, the Supreme Court had held in *Black & Decker* that treating physicians were not due any routine deference. *See id.* The court in *Colby* found that Unum unreasonably failed to consider the opinion of a claimant's treating physician when "[n]o evidence in the [r]ecord contradict[ed]" the claimant's medical reports. *Colby*, 328 F. Supp.2d at 192. The court noted, *inter alia*, that "[n]owhere does Unum allege that [the claimant] is participating in activities that belay the restrictions and limitations imposed by his physicians[.]" *Id.* Here, by contrast, Unum does make that allegation.

state that the diagnosis was unwarranted, and Unum itself does not challenge the diagnosis, but rather the effect of the condition on Ellis's physical capabilities. *See id.* at 10 & n.9.

Unum's March 4, 2010, letter terminating Ellis's benefits can be construed as questioning the validity of his diagnosis of fibromyalgia; however, Unum did not reject the diagnosis, and its central point was that Ellis failed to demonstrate that his condition imposed restrictions and/or limitations that would prevent a return to the occupation of Automobile Mechanic. *See* Record at 654-55. Unum noted, for example, that Ellis appeared to be maintained on less medication than would seem necessary given his stated severity of pain and could drive, use a riding lawnmower, ride a motorcycle for one hour in each direction, and do laundry and vacuuming. *See id.* at 654. Unum's May 11, 2010, letter upholding that decision likewise focused on whether Ellis had shown that he was unable to perform the job of Automobile Mechanic. *See id.* at 738-39.

Unum, thus, did not rely on an impermissible rejection of the diagnosis of fibromyalgia to terminate Ellis's benefits. *See, e.g.*, *Boardman*, 337 F.3d at 16 (rejecting claimant's argument that paper-file reviewer's skepticism as to validity of diagnoses betrayed prejudice when reviewer's central point was that, even if diagnoses were established, claimant's physical abilities were not so diminished as to prevent her from performing the duties of her own or any similar occupation).

Second, as Unum argues, *see* Defendant's Objection at 12-13, its reviewers reasonably relied in part on Ellis's reported level of activities to determine whether he had shown an inability to perform the demands of the Automobile Mechanic job and whether the restrictions assigned by Dr. Loiselle were supported.

Unum was not obliged to accept, at face value, Ellis's or Dr. Loiselle's statements regarding the degree to which fibromyalgia incapacitated him. *See, e.g.*, *Boardman*, 337 F.3d at 16 n.5 ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Adams v. UNUM Life Ins. Co. of Am.*, No. Civ.A. H-04-2179, 2005 WL 2030840, at *13, *32 (S.D. Tex. Aug. 23, 2005) (noting, "while some people may have such a severe case of fibromyalgia as to be totally disabled from working, most do not"; stating, "courts have recognized that an insurer may insist on objective proof and measures of symptoms and of limits on the ability to work, even when, as with fibromyalgia, diagnosis is difficult and subjective complaints such as 'fatigue' or 'pain' are the signature of the disease") (citations and internal quotation marks omitted).

Ellis bore the burden of proving his continuing entitlement to disability benefits. *See* Record at 66; *Morales-Alejandro v. Medical Card Sys., Inc*., 486 F.3d 693, 700 (1st Cir. 2007). Dr. Ball initially had recommended that Ellis undergo an FCE, and Ellis had agreed to do so. *See* Record at 365. However, either Dr. Ball or Ellis canceled the evaluation. *See id*. at 341, 462. Regardless of who canceled the evaluation and why, Unum was not obliged to fill the evidentiary vacuum by arranging for its own interview or examination of Ellis. *See* Record at 75 (stating that Unum might require claimants to undergo physical examinations or interviews at its expense but not promising that Unum would undertake such measures); *Richards v. Hewlett-Packard Corp*., 592 F.3d 232, 241 (1st Cir. 2010) (rejecting argument that policy language giving insurer right to have claimant undergo a physical examination limited the insurer to the use of physical exams; noting that the First Circuit has "squarely held that an insurer is not required to physically examine a claimant, and that benefit determinations may be based on

reviews of medical records"); *Morales-Alejandro*, 486 F.3d at 700 (observing that claimant's argument that administrator unreasonably failed to have him undergo an FCE or be assessed by a vocational rehabilitation specialist "show[ed] that he fail[ed] to understand that it [was] his responsibility to prove his claim").

Ellis's level of physical activity constituted objective evidence as to whether he had met his burden of showing that his fibromyalgia was disabling within the meaning of the Policy, and Unum's reviewers reasonably took it into account in making that judgment. *See, e.g., Cusson*, 592 F.3d at 225 (while evidence of claimant's activities revealed by surveillance was "by no means ironclad proof of ability to work, it [was] evidence that [the insurer] was entitled to consider"). While, as Ellis argues, *see* Plaintiff's Motion at 17, his ability to do laundry and vacuum with rest breaks, mow the lawn, and ride his motorcycle does not necessarily prove an ability to work full-time at his former occupation, that is beside the point. Unum was not required to prove that Ellis was capable of performing the job of Automobile Mechanic. Rather, Ellis was required to prove a continuing incapacity to perform that job.

The primary record evidence in support of Ellis's claim of ongoing entitlement to LTD benefits is Dr. Loiselle's opinion that Ellis's fibromyalgia prevented him from lifting more than 15 pounds repeatedly or engaging in prolonged standing or sitting. However, Unum's reviewers reasonably concluded that Ellis's reported activities were indicative of a greater capacity than found by Dr. Loiselle.[19]

---

[19] Caselaw cited by Ellis is distinguishable. The court in *Wilson*, which was decided on a *de novo* standard of review, characterized an insurer's arguments that a claimant could drive and do things around the house as "make-weight" in circumstances in which the court questioned how the insurer "could conclude that a heart attack and stroke victim in his early fifties could work full-time even at seated work, when he was literally half blind, had serious vascular problems, and suffered severe pain that deprived him of normal sleep[.]" *Wilson*, 424 F. Supp.2d at 1157 & n.6 (internal quotation marks omitted). The court in *Cooper*, which also was decided on a *de novo* standard of review, faulted an insurer's reliance on opinions of reviewing physicians who had failed to follow the insurer's explicit instructions and had ignored treating physicians' statements regarding the claimant's functional capacity. (*continued on next page*)

In sum, Unum's decision to terminate Ellis's LTD benefits on the ground that he did not demonstrate an ongoing incapacity to perform the job of Automobile Mechanic was supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I recommend that Unum's motion for judgment on the administrative record be ***GRANTED***, and that of Ellis be ***DENIED***.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of September, 2013.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

*See Cooper*, 486 F.3d at 169-70.  Ellis does not argue that Unum's reviewers failed to follow its explicit instructions. And, for the relevant time period, only Dr. Loiselle expressed an opinion as to Ellis's functional capacity, which Unum's reviewers did not ignore.  Finally, this court in *Black*, which also was decided on a *de novo* standard of review, held that it was unreasonable for an insurer to rely on the report of a reviewing physician while ignoring, without explanation, other medical information contained in the administrative record that overwhelmingly suggested that the claimant's condition had not improved to the extent that he could perform the material duties of his occupation.  *See Black*, 324 F. Supp.2d at 216.  Here, the physician reviewers summarized the evidence of record, including Ellis's ongoing pain complaints and Dr. Loiselle's opinion, and explained why they deemed the claimed restrictions unsupported.